We have a busy morning of arguments this morning with four arguments fully briefed. And the first case that we're going to hear today is G.S. Cleantech Corporation versus Atkins Energy. Mr. Pocatillo, you have reserved six minutes for your rebuttal. Is that correct? Yes, that's correct. OK, we're ready when you are. I'm ready to go, Your Honor. May it please the court. Your Honor, every claim asserted by plaintiffs had the term recovering oil, or separating oil, or an analogous term in them. Cleantech filed a motion for summary judgment that the recovered oil in each of the 14 plant defendants' facilities... I have a few fact questions for you, counsel. Yes, sir. In fact, more than a few. When did Winsness and or Cantrell provide their attorneys at Cantor with information about the letter dated July 31st, 2003? What date? In 2010, Your Honor. What's the site for that? I'll let you do this on reply. I have a bunch of site questions. OK, good. The same question for June and July. And by the way, Your Honor, there was a stipulation by the parties to that effect that was supplied in 2010. Same question for the June and July 2003 test conducted by Barlage in the test report created by Barlage in June 2003. When? They were provided to litigation counsel. I believe that the testimony of trial at the litigation trial was that the prosecuting counsel was never provided with that. Same question for the ethanol system diagram. The ethanol system diagram, I'll get you a site on that, Your Honor. Did Winsness and or Cantrell provide those documents to the first attorney, Mr. Duracell? No. When Winsness informed Cantor, the attorney, that the claimed invention was reduced to practice in 2003, what evidence was provided to Cantor to support that assertion? Excuse me, Your Honor, I think either you misspoke or I misheard. Did you say they provided it to Cantor in 2003? No, that it was reduced to practice in 2003. What evidence was provided to support that? That was a disclosure document that was provided to its counsel at the time in 2003. And that document was used to write the patent application by Duracell. Yeah. Cantor subsequently amended based on that. Cantor then did an investigation of that and then realized and then based on that, believed that that wasn't the case. That was in a privileged document, privileged, those were privileged documents were exchanged between the parties. And there was a legal conclusion that that wasn't, you know, that they didn't find it ready for patenting. And they didn't find it reduced to practice and hence ready for patenting, at least in their view. That was the testimony. So now we get to your stipulation. Yes, sir. It's 60, and the appendix is 63882, says that March 2010 date. Did anyone at Cantor know about the July 2003 letter or know about the contents or existence of that letter prior to that 2010 date? No, as a matter of fact, it surfaced in a deposition. That was the first time Cantor Coburn learned of it and at a deposition of Mr. Cantrell. Upon receiving that letter at the deposition, did Cantor ask the inventors in what format or formats the July 2003 letter was provided to AgriEnergy? Yes, it did. They did an investigation. Matter of fact, they checked out Mr. Cantrell and said that it was his general practice to bring the proposal with him. And he found receipts that showed he had been at AgriEnergy on a certain date, and he had no recollection at that time of having provided that 2003 proposal to them by email before he went there because his usual practice was he'd like to walk in and present a document of that sort. He also showed him records. Cantor Coburn did their due diligence to find the records that would support. He had travel records that he was there, that he met with them, that he met with them on the date. And Mr. Winsnet said that that was one of his practices in the past. The problem was that the document he had at that point, he didn't have any longer because he had an Earthlink account, which had like a 90-day date on it. So he didn't have a specific date that showed the email on his end. Is it true that after the July 2003 letter was received by Cantor, a Cantor attorney drafted a two-page submission to the USPTO acknowledging the letter, but claiming it was irrelevant? No. No? 2003. Is it true that 2003? No, no, in 2010. 2010. When they got the 2003 letter. Yeah. Okay. After it was received at that point. Yes. Is it true that a Cantor attorney drafted a two-page submission to the USPTO acknowledging the existence of the letter, but claiming it was irrelevant? No. That what they did was they submitted a declaration saying, submitting the proposal to the patent office and pointing out that it wasn't delivered. I'm talking about a draft that was never submitted to the USPTO. The draft that was never submitted to the patent office. There was a draft that was created, but they thought this was the most efficient way of achieving the fact that the proposal at that point was after the critical date, but still they presented the proposal to the patent office. The letter was never filed with the patent office, was it? Proposal. The 2003 letter. I'm sorry. Okay. So it was, oh, right. It was filed in the 516, the 517, and the 484, but in the 854, that was already issued. That's why I was troubled by your question. Yes. When did Cantor first see the August 1st, 2003 email with the July 2003 letter attached? Was that at the deposition? That was the first, with the actual email and where they learned that it was there, that was 2011. Okay. In April, that was right after the issuance of the 516 and the 517 patents, which is why it was cured, it was then presented in the 484 patent when it was filed. That was the fourth of those patents in that series, and after they received that, they then filed the second declaration in which they explained- April of 2012. Yeah. They explained, and well- Why did it take so long? Well, there was, because the only patent that was pending that it was relevant to was that they were trying to make sure they had all their evidence and their ducks in order before they provide it to the patent office. Moving on- And the delay, and the argument was made by counsel that there was, and the judge found that there was a delay, but that delay was prejudicial only to the patentee because that took away part of his patent time. That was not prejudicial to anyone else. Moving on to the inventors. Yes, sir. Mr. Cantrell and Mr. Winsness were asked by at least two sets of attorneys and the potential cleantech investor in 2009 for information regarding the on-sale bar specifically. Right. Why didn't they provide- I'll lump this together, it's a compound question- the July 2003 letter, the ethanol system diagram, the June 2003 test report, and why didn't they disclose the June and July 2003 test done in AgriEnergy? Well, I can go through each of those. The 2003 reports, the 2003, June and 2003, July, were not considered to be references in the sense of, to the patent office, they were considered to be conception documents showing conception of the invention and early working stages. Considered by whom? Oh, by counsel, by counsel. And so, therefore, in consistent with the ready for patenting argument, the product, the patent wasn't ready for patenting, and consistent with the fact that it didn't have an enabling disclosure as opined upon by the experts, by plaintiff's experts as well. It was clearly thought that that could be, it wouldn't be a relevant piece of prior art. And again, it just wasn't part of the proposal. The proposal, if you recall, and the counsel testified to this. I want to keep going. Okay, go ahead. In the blue brief at 39 and 40, in your list of Allen factors. Yes, sir. Do you accurately recite factors one and 10? Recite factors one and 10 as experimental use? And does the evidence you recite to satisfy one and 10 meet all the requirements of those factors? I thought, I believe they do, Your Honor, because the question of these people doing these tests on these bench type centrifuges could not tell them whether this product could work for its intended purpose. And so, and the understanding was, is this, as they divide, and these were small guys, I mean, who had been in the poultry industry, knew that. They now are applying this to hopefully an ethanol plant. They had to find out if it worked in an ethanol plant. The only way they could do this was to test it. The only way they could do was experiment with it. The only way they could find out if it worked for its intended purpose was to go into an ethanol plant. The character of the July test was using a- How do you explain them going to the plant where they tested, supposedly? In July. And saying, hey, if you'll sign an affidavit saying we didn't offer this for sale, then we'll give you some benefits. And the response of that plant saying, no, that's not true. Well, they honestly went to these people at this point in the middle of this morass of this lawsuit looking for people as witnesses because they honestly believed that it wasn't a sale and they were looking for assistance and nobody would- Everyone was walking away from it. They had a benefit to walking away from it. Not showing up as a witness for AgriEnergy to say that was a benefit to AgriEnergy. Obviously, they would wind up getting this for free instead of having to pay a royalty. So they were trying to get testimony that would help them. When you're in a lawsuit- By offering something of value. Well, how appropriate, Your Honor, to the recent conversations. But yes, something of value to get cooperation. Because in the sense of, I understand, Your Honor, that this is a point. Doesn't it smell like suborning perjury? No. It smells like getting the truth because you love to testify under oath to the truth, don't you? People will not testify. As a practicing lawyer, when you subpoena people, they fight you. Wait a minute. You're saying that you had to offer them essentially a bribe to get them to tell the truth. They were trying to get assistance. Instead of just subpoenaing, don't talk over me. I apologize, Your Honor. Instead of subpoenaing them, putting them in a deposition, and ordering them to testify under truth. You think they would have lied in the deposition if you asked them those questions? No, I don't.  I'm sorry. You just suggested, I think wholly inappropriately, that the only way to get these people at this company to tell the truth was to offer them something of value. And I find that very offensive. Well, Your Honor, I was just suggesting that it was a sense of, I thought they were looking for cooperation. You still got to tell the truth under oath. You still got to get people to show up. You got to get people to give you documents. You're well into your rebuttal time. I see that. But we'll restore some of your time. All right. Thank you. Thank you. Mr. Weyruch, is that correct? This is Mr. Buchanan. Mr. Buchanan. And you're up for 13 minutes. And Mr. Weyruch is for two minutes. Is that for the cross-claim? So I'm going to be arguing the 585 patent issues on behalf of all defendants. There's an 037 patent that is asserted against a subset of defendants. And Mr. Weyruch will be addressing the 037 patent issues. Okay. May it please the Court, my name is Michael Buchanan. I'm with the law firm of Patterson, Gelnap, Webb & Tyler. I'm sure you were listening to your friend. Yes, I was listening. Do you have any clarifications regarding the legal or factual assertions your friend made? I do. In response to the questions I had. Yes. I thought you might. The test document is cited in the record at 11075. It's an invention disclosure that was written by Mr. Winsness in June of 2004. He provided that document both to Mr. Derisio, the first patent attorney, and to Mr. Haggerty, the second patent attorney. In that document, Mr. Winsness writes that the June and July 2003 testing established four important points. Number one, water separates easily from the oil. That's a key point. Number two, the solids will not foul the centrifuge. Number three, these tests led them to believe it would work on a commercial basis. And number four, in the Barloggi test report, he labels it as the first discovery in 2003. Mr. Derisio, the first patent attorney, prepares an opinion based on that document in which he represents that the parties have told him, Mr. Winsness and Mr. Cantrell have told him that they reduced their invention to practice prior to the Prevo's reference, which was published or filed on July 15, 2003. So they're representing to their first and second patent attorney that they had a reduction to practice before July 15, 2003. So that's the first clarification. The second clarification is the Cantrell, August 1, 2003, email was provided to Cantor Colburn at a deposition in September of 2011. Cantor Colburn, Mr. Haggerty, continued to prosecute the 484 patent to allowance without correcting a patently false declaration. Without clarifying and telling the patent examiner, we were wrong, we gave you false information about the date of the transmittal. And never correcting the 2004 feasibility testing representation that was in existence in all these patent families. I'm not asking you for cites to the record, because my belief is that's exactly what the record shows. And I think it's important, you know, the key, there are several key findings by Judge McKinney. And of course, we're here to determine whether their burden to show that he committed clear error in the facts, and you can't on this record. I think one of the key findings by Judge McKinney is, quote, material documents related to the true invention story and the on sale bar were never revealed to the PTO in the prosecution of any patent in the 858 patent family. And the inventors allowed the false story to be told. And that's at page 300 of the appendix. That is an overarching finding by the finder of fact, seeing the testimony of the inventors and the lawyers where, you know, honestly, the on sale bar issues were re-litigated. They claimed that there was, you know, they were prevented from presenting evidence. That is completely untrue. There are too many record sites to advise the court where the inventors and the lawyers re-argued whether this was a commercial offer for sale, or whether it was for an experiment, whether it was reduced to practice, or whether the tests were failures, whether these documents were cumulative or irrelevant or immaterial. The record is very clear. All of that evidence was before the judge as the finder of fact. He was sitting there observing the demeanor of the witnesses, and he made very specific finding of facts. On all of the fact factors, he reiterates that this was a commercial offer for sale. I think that's clear, and I'd be happy to discuss those issues if you want to hear more about that. He found specifically that there was a reduction to practice prior to the disclosure in August 1st, 2003. He found that these were enabling disclosures prepared before that date. He covered every one of the fact factors. He found the sale, offer of sale. And then he went through the Theracense factors, and he found that the information that there was a patently false declaration that is per se materiality. The feasibility test letter was per se material. Their failure to disclose known information in the context of an on-sale bar, which this court has said is particularly troublesome because the Patent Office has no fact-finding ability. And he has found all those factings. He found intent and numerous specific findings relating to the inventors and specifically to the lawyers, both Litigation Counsel and the Prosecuting Counsel. And you had a rare case where the prosecuting lawyer was present in court and testified to his thought process, and the judge rejected that testimony. And the rejection is for good reasons. There is no contemporaneous document that reflects any question that this invention worked for its intended purpose and that it was reduced to practice. There is a laundry list of statements by these inventors prior to the critical date. We know this works on a commercial basis. And all of their actions are consistent with that, from them drafting an offer letter the day after the July test, to them assembling a sales and marketing team, to preparing a drawing that would be used for sales purposes with customers, to driving, flying from Georgia to Minneapolis, and then driving to Laverne, Minnesota for the purpose of making a sales pitch. All of the evidence is completely consistent with that. And the judge sitting as the finder of fact made specific findings. And absent a clear error or abuse of discretion, we submit that it should be upheld. And with that decision being withheld, all the other issues in this case are resolved. So unless the panel has questions for me, I think I'll... Well, I have a couple of comments. Sure. One is, the only thing the appellants say, which might, to me, which might have a width of a possibility of being true, is the claim that one of the inventors was mentally incompetent by the time he reached testimony. And I have no idea whether that's true or not, since there wasn't any evidence. That's not true. He had some physical ailments, but I specifically asked him, in my opening line of questions, whether there was anything that would prevent him providing truthful testimony. He said no. And one of the true things I think he said, one of the only true things I think he said during the course of his testimony, there was no evidence to support that. The other thing I have is a question. Given Cantor's conduct, was anything referred to the bar? I'm not sure that's in the record, but I'm assuming that that has happened. Thank you. Thank you, Your Honor. Thank you. Your Honor, I'm going to yield my time. Okay, thank you very much. Mr. Pocatello, you have four minutes. Thank you, Your Honor. Let me go back to the question you asked about. When AgriEnergy was approached, Mr. Rye, the lawyer, wrote him a letter. The fact that Mr. Winsness went to see them, I think the judge made a specific finding about Mr. Winsness and Mr. Cantrell, that they lacked the sophistication. Uh, he specifically did not make a finding of specific intent to mislead the patent office by either of them, which would have been essential under a Therosense analysis. And I would point out that when he... It's not my recollection of the record, but I'll look. I'll try to give you that sight, if we can, quickly, while I'm talking to you, Your Honor. But on the other hand, what I was going to say to you is that... I remember him saying they were unsophisticated, but I don't remember him saying that that they were not able to form an intent to fraud. Well, that's right. He didn't make that finding, which would have been required if you were going to suggest that the inequitable conduct was caused by the inventors, not the lawyers. Now, moving to the lawyers, the court never, under the Ohio-Willowood type standard that we've talked about in Therosense, ever asked or ever found that they believed these documents were material and that they misrepresented them to the patent office for the purpose of getting patents. That was never a finding made by the court. Under Ohio-Willowood, we talk about the fact that you've got to know, you've got to establish the materiality of the document. You've got to understand that the people understood why that document would unequivocally, or not unequivocally, but would force the patent office to- Gee, based on my review of the facts, the record screams of fraud by counsel. Your Honor, I think that if you look at counsel and their testimony, they believed they were bringing this information to the patent office's attention. The only word, when I use the word promptly with the exception of that delay that I talked about where that delay was caused by they were trying to get the facts from Mr. Winses, who on the record, you'll see was ill for a period of time during this testimony period. We had to hold up depositions for months. They had to while he was, because he was too ill to testify. That is in the record. Having said that, Your Honor, there is clearly, under the Ohio-Willowood standard of materiality and an intent to deceive the patent office, what would be the purpose of deceiving the patent office of this? They wanted these patents. They wanted valid patents to enforce. And they were in the middle of a litigation. The idea that they thought that they were intentionally deceiving the patent office is not borne out by the record. And it's borne out by the, when you look at the way the judge characterizes it, it makes it sound as if that's the only implication of it. But he never makes a specific finding that they knew it was material, that they withheld it to deceive the patent office, which is the requirement that gets you to your theory sense standard of inequitable conduct. First of all, using the perfect example of the first patent that issued, they could have done that because they could have had a specific intent to mislead the patent office because they didn't have the document yet, which is why I thought you asked your question to begin with. And the second and third patents, the 516 and the 517, they couldn't, they gave them the best information they had. They gave them the proposal and they gave them the declaration that it wasn't delivered. Now, the proposal, if you read Mr. O'Brien's testimony, that proposal as he looked at it was for a test module, not for the method of doing it. And therefore he felt it was under plum tree, clearly not a invalidating offer. And he believed that in part because there was no claim features shown in the offer, other than the fact that they were going to send a test module. What was that test module? It had to be hooked up. It had to be arranged. So he didn't believe that that test module and that document within its four corners was an invalidating reference, but he still provided it. I think we have your argument. You're out of time. We thank you though for your argument. We thank all parties for your argument. Thank you, Your Honor.